NORTHERN INSURANCE COMPANY OF
NEW YORK V B ELLIOTT, LTD

Docket No. 53996. Submitted December 2, 1981, at Detroit.—Decided
June 22, 1982. Leave to appeal applied for.

Northern Insurance Company of New York as the subrogee of
Schreiber Manufacturing Company, Inc., brought an action in
the Oakland Circuit Court against B. Elliott, Ltd., a Canadian
Corporation, and B. Elliott, Inc., a Delaware corporation. El-
liott-Delaware brought a third-party action against Schreiber.
The underlying facts are that Elliott-Canada is engaged in the
installation, sale, and distribution of machinery in Canada.
Elliott-Delaware is engaged in the sale, distribution, and instal-
lation of machinery in the United States. Although the two
corporations have some officers in common, they are operated
as separate and independent entities. On October 14, 1976,
Schreiber ordered a boring mill from Elliott-Delaware. The
purchase contract was part of a purchase money security
agreement executed by Elliott-Delaware and Schreiber. Elliott-
Delaware placed an order for the purchase of the boring mill
with Elliott-Canada, and the latter company ordered the mill
from its manufacturer, Union Gera, an East German company.
Union Gera sold and delivered the mill to Elliott-Canada in
Toronto. The latter company sold and delivered the mill to
Elliott-Delaware in Buffalo, New York. In turn Elliott-Delaware
shipped the mill to Schreiber's plant in Clawson, Michigan.
After the machine was delivered to Schreiber's plant, the
machine's installation was inspected by Terry Hellowell in
February, 1977. Hellowell was an employee of Elliott-Canada
and was loaned to Elliott-Delaware for purposes of inspecting
the mill. Hellowell acted as an agent of Elliott-Delaware in
inspecting the machine's installation and Elliott-Canada was
paid $2,000 by Elliott-Delaware for Hellowell's services. On
August 30, 1977, the boring mill's counterweight crashed into

REFERENCES FOR POINTS IN HEADNOTES

[1] 62 Am Jur 2d, Process § 75.
[2-4, 7] 62 Am Jur 2d, Process § 79.
[5] 44 Am Jur 2d, Insurance § 1794.
[6] 17 Am Jur 2d, Contracts § 105.

the machine. Both Elliott corporations were notified of the accident within 24 hours. A representative of Elliott-Canada went to inspect the damaged machine at the request of Elliott-Delaware and reported that the boring mill was a complete loss. Schreiber submitted a claim under its insurance policy to the Maryland Casualty Company. The record does not disclose the exact nature of the relationship of Maryland Casualty and Northern Insurance. Schreiber sought compensation for the damage to the machine and for business interruption losses. On April 28, 1978, Schreiber wrote to Elliott-Delaware informing it that Schreiber's insurance company had rejected its claim because of inherent defects in the machine caused by the negligence of the manufacturer. Schreiber demanded payment from Elliott-Delaware in the amount of $228,000 for the damaged machine and $125,000 for business interruption losses. On June 13, 1978, representatives of Schreiber, Elliott-Delaware and Union Gera conducted negotiations with respect to Schreiber's claims. Schreiber's attorney informed the parties present that Schreiber's insurer had rejected the company's insurance claim. In fact, according to the attorney's deposition of June 26, 1980, Schreiber had been offered $50,000 by plaintiff to compensate it for business interruption losses prior to the June 13, 1978, meeting. Elliott-Delaware contended that it was never informed that Schreiber had rejected an offer made by plaintiff. While the deposition avers that Elliott-Delaware was specifically informed at the June, 1978, meeting that negotiations were continuing between Schreiber and plaintiff for benefits under the policy issued by the Maryland Casualty Company, said deposition does not dispute Elliott-Delaware's contention that it was not told of the insurer's settlement offer. The participants at the June, 1978, meeting agreed to settle Schreiber's claim by Elliott-Delaware, Union Gera, and Schreiber each assuming one-third of the cost of a new machine. Elliott-Delaware also agreed to remove the damaged machine and install the new machine. The minutes of this meeting showed that the parties agreed to release Elliott-Delaware and others from any further claim. The tentative agreement of June 13, 1978, was formalized by letters from Schreiber's attorney to Elliott-Delaware dated July 25, 1978, and August 1, 1978. Both letters were subsequently signed by a vice president of both Elliott corporations as indicating approval of the agreement on behalf of Elliott-Delaware and Union Gera. The August 1, 1978, letter stated in part that: "In consideration of the execution of the letter agreement by Elliott, Schreiber will furnish to Elliott and Union Gera a covenant not to sue in

relation to the old machine." Elliott-Delaware completely fulfilled its obligations under the agreement by October, 1978. In December, 1978, plaintiff paid Schreiber $75,000 as compensation for business interruption losses. Plaintiff then instituted action in federal district court against Elliott-Canada, alleging negligent inspection of the boring mill. This suit was ultimately voluntarily discontinued. Not until September 7, 1979, did Schreiber actually execute the covenant not to sue in favor of Elliott-Delaware for all damages of any kind. The court, Steven N. Andrews, J., dismissed Elliott-Canada as a party for lack of personal jurisdiction and granted a judgment of dismissal for Elliott-Delaware for the reasons that the claim was barred because Elliott-Delaware was a beneficiary of the covenant not to sue. Plaintiff appealed. *Held:*

1. Proof that a nonresident caused an effect in Michigan that was foreseeable does not establish a relationship to Michigan such as to make it fair and reasonable to subject the nonresident to jurisdiction. For a state to have long-arm jurisdiction over a defendant, it is essential in each case that there be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus involving the benefits and protections of its laws. Nothing in the record indicates that Elliott-Canada purposely availed itself of the privilege of conducting business in Michigan, and the court was correct in dismissing it as a party.

2. The agreement not to sue was made June 13, 1978, and noted in writing on July 25 and August 1, 1978, prior to any payment by plaintiff to Schreiber. The agreement is valid and prevents plaintiff, as Schreiber's subrogee, from recovering from Elliott-Delaware.

Affirmed.

J. H. GILLIS, dissented. He would hold that Elliott-Canada's sale of the boring mill to Elliott-Delaware with knowledge that it would be installed and operated in Michigan by plaintiff's subrogor constituted purposeful availment of the privilege of transacting business in the forum state, sufficient to create limited personal jurisdiction. He also believed there exists a material question of fact as to whether Schreiber's agreement to execute a covenant not to sue barred all of the claims in this lawsuit and would find error in the grant of accelerated judgment to Elliott-Delaware.

OPINION OF THE COURT

1. COURTS — JURISDICTION — LONG-ARM STATUTES.

Michigan's "long-arm" statutes extend jurisdiction over nonresidents to the maximum limits permitted by due process.

2. COURTS — JURISDICTION — LONG-ARM STATUTES — DUE PROCESS.

For a state to have long-arm jurisdiction over a defendant, it is essential in each case that there be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus involving the benefits and protections of its laws.

3. COURTS — JURISDICTION — LONG-ARM STATUTES — PURPOSEFUL AVAILMENT.

A "purposeful availment" by a nonresident of the privilege of conducting activities in Michigan sufficient to justify the state in exercising long-arm jurisdiction over him is something akin either to a deliberate undertaking to do or cause an act or thing to be done in Michigan or conduct which can properly be regarded as a prime generating cause of the effects resulting in Michigan, something more than a passive availment of Michigan opportunities (MCL 600.705; MSA 27A.705).

4. COURTS — JURISDICTION — LONG-ARM STATUTES — FORESEEABLE EFFECT.

Proof that a nonresident caused an effect in Michigan which was foreseeable does not establish a relationship to Michigan such as to make it fair and reasonable to subject the nonresident to jurisdiction.

5. SUBROGATION — INSURANCE.

An insurer, as subrogee of its insured, has no greater rights against a tortfeasor than its insured had.

6. CONTRACTS — AGREEMENTS TO EXECUTE DOCUMENTS.

It is possible for parties to make an enforceable contract binding them to prepare and execute a subsequent agreement; in such cases, where agreement is expressed on all essential terms, the instrument is considered a mere memorial of the agreement already reached.

DISSENT BY J. H. GILLIS, J.

7. COURTS — JURISDICTION — LONG-ARM STATUTES — DUE PROCESS.

*A forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state.*

*Denenberg, Tuffley, Thorpe, Bocan & Patrick* (by
*Irene Gordon),* for plaintiff.

*Dahlberg, Mallender & Gawne* (by *Fred Mallender, II,* and *Thomas E. Callow),* for defendants.

Before: DANHOF, C.J., and J. H. GILLIS and BRONSON, JJ.

BRONSON, J. Plaintiff appeals as of right from two orders entered in the Oakland County Circuit Court which summarily disposed of its actions against defendants, B. Elliott, Ltd. (hereinafter Elliott-Canada), and B. Elliott, Inc. (hereinafter Elliott-Delaware). Elliott-Canada was dismissed by the court as a party in this case on the basis that it lacked personal jurisdiction over the corporation. GCR 1963, 116.1(1). Although the court granted Elliott-Delaware's motion for summary judgment based on GCR 1963, 117.2(3), no genuine issue as to any material fact, it recognized that it was really basing its ruling on GCR 1963, 116.1(5), accelerated judgment, for the reason that the claim was barred as Elliott-Delaware was the beneficiary of a covenant not to sue agreed to by the injured party, Schreiber Manufacturing Company (hereinafter Schreiber). Schreiber is not a party to this appeal. The relevant facts follow.

Plaintiff is a foreign corporation licensed and authorized to provide businesses in Michigan with property insurance. Elliott-Canada is engaged in the installation, sale, and distribution of machinery in Canada. Elliott-Delaware is engaged in the sale, distribution, and installation of machinery in the United States. Although the two Elliott corporations have some officers in common, they are operated as separate and independent entities.

On October 14, 1976, Schreiber ordered a boring

mill from Elliott-Delaware. The purchase price
was $173,000 and the purchase contract was part
of a purchase money security agreement executed
by Elliott-Delaware and Schreiber, dated November 8, 1976. Elliott-Delaware placed an order for
the purchase of the boring mill with Elliott-Canada, and the latter company ordered the mill from
its manufacturer, Union Gera, an East German
company.

Union Gera sold and delivered the mill to Elliott-Canada in Toronto. The latter company sold
and delivered the mill to Elliott-Delaware in Buffalo, New York. In turn Elliott-Delaware shipped
the mill to Schreiber's plant in Clawson, Michigan.

After the machine was delivered to Schreiber's
plant, the machine's installation was inspected by
Terry Hellowell in February, 1977. Hellowell is an
employee of Elliott-Canada. However, he was
loaned to Elliott-Delaware for purposes of inspecting the mill. Hellowell acted as an agent of Elliott-Delaware in inspecting the machine's installation
and Elliott-Canada was paid $2,000 by Elliott-Delaware for Hellowell's services.

On August 30, 1977, the boring mill's counterweight crashed into the machine. Both Elliott
corporations were notified of the accident within
24 hours. A representative of Elliott-Canada, Ross
Binnie, went to inspect the damaged machine at
the request of Elliott-Delaware. Peter Manchur, a
vice president in both Elliott corporations, could
not recall whether Elliott-Delaware had reimbursed Elliott-Canada for Binnie's services. In any
case, Binnie submitted a report stating that the
boring mill was a complete loss.

Schreiber submitted a claim under its insurance
policy to the Maryland Casualty Company. Apparently this firm is related to plaintiff or plaintiff

has taken it over. However, the record does not disclose the exact nature of their relationship. Schreiber sought compensation for the damage to the machine and for business interruption losses. On April 28, 1978, Schreiber wrote to Elliott-Delaware informing it that Schreiber's insurance company had rejected its claim because of inherent defects in the machine caused by the negligence of the manufacturer. Schreiber demanded payment from Elliott-Delaware in the amount of $228,000 for the damaged machine and $125,000 for business interruption losses.

On June 13, 1978, representatives of Schreiber, Elliott-Delaware, and Union Gera met at the Detroit Metropolitan Airport and conducted negotiations with respect to Schreiber's claims. Schreiber's attorney, A. Albert Sugar, informed the parties present that Schreiber's insurer had rejected the company's insurance claim. In fact, according to Sugar's deposition of June 26, 1980, Schreiber had been offered $50,000 by plaintiff to compensate it for business interruption losses prior to the June 13, 1978, meeting. Elliott-Delaware contends that it was never informed that Schreiber had rejected an offer made by plaintiff. While Sugar's deposition avers that Elliott-Delaware was specifically informed at the June, 1978, meeting that negotiations were continuing between Schreiber and plaintiff for benefits under the policy issued by the Maryland Casualty Company, said deposition does not dispute Elliott-Delaware's contention that it was not told of the insurer's settlement offer.

The participants at the June, 1978, meeting agreed to settle Schreiber's claim by Elliott-Delaware, Union Gera, and Schreiber each assuming one-third ($51,666.33) the cost of a new machine. Elliott-Delaware also agreed to remove the damaged machine and install the new machine. The

minutes of this meeting further disclose that the parties agreed to release Elliott-Delaware and others from any further claim.

The tentative agreement of June 13, 1978, was formalized by letters from Schreiber's attorney to Elliott-Delaware dated July 25, 1978, and August 1, 1978. Both letters were subsequently signed by Peter Manchur as indicating his approval of the agreement on behalf of Elliott-Delaware and Union Gera. The August 1, 1978, letter stated in part that: "In consideration of the execution of the letter agreement by Elliott, Schreiber will furnish to Elliott and Union Gera a covenant not to sue in relation to the old machine."

Elliott-Delaware completely fulfilled its obligations under the agreement by October, 1978. In December, 1978, plaintiff paid Schreiber $75,000 as compensation for business interruption losses. Plaintiff then instituted action in federal district court in Detroit against Elliott-Canada, alleging negligent inspection of the boring mill. This suit was ultimately voluntarily discontinued. Not until September 7, 1979, did Schreiber actually execute the covenant not to sue in favor of Elliott-Delaware for all damages of any kind that it had sustained as a consequence of the boring machine accident. In October, 1979, plaintiff, as subrogee of Schreiber, filed the present suit against both defendants.

I

Plaintiff's first claim on appeal is that the circuit court erred in holding that Elliott-Canada lacked sufficient minimum contacts with the State of Michigan to allow it to be sued, consistent with concepts of fair play and substantial justice, in a

Michigan court. See *International Shoe Co v Washington,* 326 US 310, 320; 66 S Ct 154, 160; 90 L Ed 95, 104 (1945). The correct approach to jurisdictional problems of the type posed here is to analyze whether exercise of personal jurisdiction is precluded on either statutory or constitutional grounds. However, all agree that, if constitutionally permissible, MCL 600.715(2); MSA 27A.715(2)[1] would allow Michigan to assume jurisdiction as the forum state in this case. It has been said that this state's "long-arm" statutes extend jurisdiction to the maximum limits permitted by due process. *Sifers v Horen,* 385 Mich 195, 199; 188 NW2d 623 (1971). For purposes of the type of personal jurisdiction problem we must resolve in this case, the constitutional and statutory tests are the same.[2]

In *Khalaf v Bankers & Shippers Ins Co,* 404 Mich 134, 153; 273 NW2d 811 (1978), the Supreme Court held that an essential consideration in ascertaining if Michigan constitutes a proper forum is

---

[1] This provision provides:

"The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:

\* \* \*

"(2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort."

[2] In *Hapner v Rolf Brauchli, Inc,* 404 Mich 160, 168, fn 2; 273 NW2d 822 (1978), Justice LEVIN takes exception with this proposition. His position is based on the fact that the Michigan statute does not simply provide that nonresidents are subject to suit in Michigan to the fullest extent permissible under the federal constitution. It is not self-evident that, merely because the Michigan statute does not simply provide for jurisdiction over nonresidents to the limits of the law, it does not have this effect. In any case, it is impossible to imagine a tort action in which MCL 600.715(2); MSA 27A.715(2) would not allow Michigan to assume jurisdiction, in which this assumption would be constitutionally permissible.

whether the defendant has "purposely availed" itself of the privilege of conducting business in Michigan. The Court further indicated:

"A 'purposeful availment' is something akin either to a deliberate undertaking to do or cause an act or thing to be done in Michigan or conduct which can be properly regarded as a prime generating cause of the effects resulting in Michigan, something more than a passive availment of Michigan opportunities. The defendant will have reason to foresee being 'haled before' a Michigan court." *Id.*, 153-154.

See, also, *Hanson v Denckla,* 357 US 235, 253; 28 S Ct 1228; 2 L Ed 2d 1283 (1958). This "purposeful availment" test will be applied to the facts of this case.

Plaintiff first asserts that Michigan is a proper forum for this action because Terry Hellowell, who inspected the boring mill in Michigan, was an employee of Elliott-Canada. The acts conducted by Hellowell in Michigan could constitute a "purposeful availment" of opportunities in this state by Elliott-Canada, if these acts could be attributed to the Canadian corporation. However, we find that they cannot.

The sales agreement between Schreiber, plaintiff's subrogor, and Elliott-Delaware required the latter corporation to come to Michigan to inspect the boring mill. Toward this end, Elliott-Delaware procured by contract with Elliott-Canada the right to borrow Hellowell. Elliott-Delaware, and not Elliott-Canada, controlled Hellowell's work duties while he was in Michigan. Elliott-Canada had no interest in Hellowell's activities in Michigan, and Hellowell acted solely as Elliott-Delaware's agent while in Michigan. Schreiber had no contractual arrangements with Elliott-Canada. In view of the

fact that the record shows Hellowell was acting solely as the agent of Elliott-Delaware insofar as the inspection of the machine is concerned, if Hellowell's inspection was negligent, these acts of negligence are attributable solely to Elliott-Delaware. Elliott-Canada cannot be said to have purposely availed itself of business opportunities in Michigan when it merely loaned its employee to Elliott-Delaware who then had complete control over said employee's activities in Michigan.

Plaintiff also asserts that Elliott-Canada can be sued in Michigan as one distributor in the chain of events which led to the machine's malfunction with adverse consequences manifested inside Michigan. Union Gera sold the boring mill to Elliott-Canada, which in turn sold it to Elliott-Delaware, which in turn sold it to Schreiber. To support this stream of commerce theory for personal jurisdiction over Elliott-Canada, plaintiff relies on *Gray v American Radiator & Standard Sanitary Corp,* 22 Ill 2d 432; 176 NE2d 761 (1961), and cases with similar holdings. In *Gray,* the Illinois Supreme Court found that personal jurisdiction existed over a foreign manufacturer of allegedly defective safety valves incorporated into another foreign manufacturer's water heaters, one of which exploded and injured an Illinois resident in Illinois. *Gray* was premised on the fact that "advanced means of distribution" had resulted in substantial use and consumption of defendant's valves inside the State of Illinois and that defendant had benefited from the protection state laws gave to the marketing of water heaters containing the errant valves. For a similar Michigan holding, see *Bratton v Trojan Boat Co,* 19 Mich App 236; 172 NW2d 457 (1969).

Elliott-Canada argues that decisions such as

*Gray* and *Bratton* are inapplicable to the instant case because this matter involves a mere distributor, not a manufacturer, of a product. We find this distinction to be irrelevant. In *World-Wide Volkswagen Corp v Woodson,* 444 US 286, 297-298; 100 S Ct 559; 62 L Ed 2d 490 (1980), the United Stated Supreme Court noted *Gray* approvingly and further indicated that, to the extent either a distributor or manufacturer generally delivers its products into the stream of commerce with the expectation that they will be purchased in the forum state, that state may assert personal jurisdiction over the corporation.

*World-Wide Volkswagen, supra,* is instructive for its discussion of the quantity and quality of contacts which are needed to find "purposeful availment" sufficient to sustain a state's exercise of personal jurisdiction over a corporation on a stream-of-commerce theory. In *World-Wide Volkswagen,* plaintiffs had purchased an automobile imported into the United States by Volkswagen and sold through a New York retailer. Plaintiffs' automobile was struck from behind in Oklahoma and the gas tank exploded. Plaintiffs filed a products liability suit in Oklahoma seeking to hold liable, among others, the New York retailer and the car's regional distributor. The Oklahoma Supreme Court held that the retailer and distributor could be sued in Oklahoma, despite the fact that neither performed sales or services there. The court reasoned that automobiles are inherently mobile, and it is readily foreseeable by a retailer and distributor that one of its cars will be used for the purpose it was intended, resulting in an accident outside its sales and service territory. The United States Supreme Court reversed, holding:

"Petitioners carry on no activity whatsoever in Okla-

homa. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma.

"It is argued, however, that because an automobile is mobile by its very design and purpose it was 'foreseeable' that the Robinsons' Audi would cause injury in Oklahoma. Yet 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause. In *Hanson v Denckla, supra,* it was no doubt foreseeable that the settlor of a Delaware trust would subsequently move to Florida and seek to exercise a power of appointment there; yet we held that Florida courts could not constitutionally exercise jurisdiction over a Delaware trustee that had no other contacts with the forum State. In *Kulko v California Superior Court,* 436 US 84 [98 S Ct 1690; 56 L Ed 2d 132] (1978), it was surely 'foreseeable' that a divorced wife would move to California from New York, the domicile of the marriage, and that a minor daughter would live with the mother. Yet we held that California could not exercise jurisdiction in a child-support action over the former husband who had remained in New York." *World-Wide Volkswagen, supra,* 444 US 286, 295-296.

Like the automobile retailer and distributor in *World-Wide Volkswagen,* Elliott-Canada has never done or sought business in Michigan. Indeed, Peter Manchur, Elliott-Canada's vice president, stated in his affidavit that Elliott-Canada's business activities were restricted to the Dominion of Canada.

Nonetheless, it could be argued that the instant case is distinguishable from *World-Wide Volkswagen* on the theory that Elliott-Canada knew the boring mill was going to end up in Michigan, while the New York retailer and distributor in *World-Wide Volkswagen* did not. The majority opinion in *World-Wide Volkswagen* is unclear as to what extent actual knowledge of where the product will be used makes a difference to the constitutional analysis. If the Supreme Court would have held a New York automobile retailer susceptible to suit in Oklahoma had the retailer known he was selling a car to Oklahoma residents merely visiting in New York who intended to return to Oklahoma, then Elliott-Canada's knowledge that the machine would be used in Michigan makes this state an appropriate forum for suit.

Since the Supreme Court has not clearly resolved this problem, we turn to a consideration of cases that have. In many respects, the instant controversy resembles the problem posed in *Iowa Electric Light & Power Co v Atlas Corp,* 603 F2d 1301 (CA 8, 1979), *cert den* 445 US 911; 100 S Ct 1090; 63 L Ed 2d 327 (1980). There, plaintiff sought specific performance of a contract. Plaintiff had sought bids for uranium ore through a fuel management consulting firm in Washington, D.C. Defendant was incorporated in Delaware, had its principal offices in New Jersey, the offices of its mineral division, which was involved with the bid sent to the Washington, D.C., firm, in Colorado, and its mining operations in Utah. The ore which was extracted was known to be for ultimate use in Iowa. However, defendant did no business in Iowa, and it delivered the ore in Illinois. In Illinois the ore was refined so that it could be used in plaintiff's operations. The circuit court reversed the

lower court's finding that Iowa was a proper forum state, holding:

"[A] seller's knowledge that his product is 'destined' in some form for the forum is not necessarily sufficient contact with that state to confer jurisdiction over the seller, particularly in the absence of any other voluntary contacts with the forum state. See, also, *Charia v Cigarette Racing Team, Inc,* 583 F2d 184, 189 (CA 5, 1978); *Benjamin v Western Boat Building Corp,* 472 F2d 723, 730 (CA 5, 1973), *cert den* 414 US 830; 94 S Ct 60; 38 L Ed 2d 64 (1973); *Golden Belt Mfg Co v Janier Plastic Mold Corp,* 281 F Supp 368, 370-371 (MD NC, 1967), *aff'd* 391 F2d 266 (CA 4, 1968)." 603 F2d 1301, 1306 (footnote omitted).

In *Khalaf, supra,* the Michigan Supreme Court reached the same conclusion in dicta. Although *Khalaf* involved a defendant who did not know, but who merely had reason to know, that the party it was insuring might do business in Michigan, the Court also concluded that the existence of actual knowledge would have made no difference, assuming the facts were otherwise unchanged. The Court stated:

"If causing foreseeable effects alone constituted purposeful availment, a Chicago grocery store supplying consumables, a haberdashery or boutique providing clothing, or a marina purveying boat supplies, to a person known to have a Michigan cottage, or a physician performing cosmetic surgery on him, could be subject to Michigan long-arm jurisdiction. In each instance the Chicago provider knows that the product or service is for use in Michigan, and that negligent performance will cause effects in Michigan. The enterprise is commercial, affecting the stream of commerce. But the nature of the provider's business is nevertheless so clearly localized that proof of transactions with Michigan residents should not alone subject the provider to long-arm jurisdiction. The generating cause is not the

provider's desire to enlarge his business into Michigan but, rather, the Michigan customer's desire to do business with the Chicago provider." 404 Mich 134, 156-157.

In the instant case, plaintiff, through affidavits or otherwise, did not dispute Elliott-Canada's claim that it did no business in Michigan and had no desire to do business in Michigan. Elliott-Canada's contract with Elliott-Delaware for the boring mill, even knowing that the machine would be used in Michigan, did not show a "purposeful availment" of business opportunities in Michigan.

The excerpt from *Khalaf,* above, speaks of "localized" businesses which do not depend on distribution of products between states or countries. Elliott-Canada, however, is not such a "localized" type of business entity. Nonetheless, we believe that *Hapner v Rolf Brauchli, Inc,* 404 Mich 160; 273 NW2d 822 (1978), supports the conclusion that a corporation whose business is dependent on extensive multi-state or multi-national distribution networks may nonetheless fall within the ambit of *Khalaf* so long as said corporation's products are not distributed pursuant to a marketing scheme evincing "purposeful availment" of the privilege of transacting business inside the forum. Thus, in *Hapner,* the Supreme Court concluded that, on the record before it, the Swiss manufacturer of household products could not be sued in Michigan where said manufacturer merely sold its goods to three independent importers in the United States, none of whom were located in Michigan. While noting that it was foreseeable from the Swiss manufacturer's perspective that one of its products might end up in Michigan, the Court in *Hapner* further observed that the record failed to show that the manufacturer's distribution system could be said to constitute a purposeful availment of business

opportunities in Michigan. In this case, there is not even evidence tending to show that Elliott-Canada regularly exports products for resale to the United States. The record shows only that on one occasion a machine it handles for distribution in Canada was sold to an American corporation, was ultimately brought to Michigan, and, while in the state, failed. The record shows that Elliott-Canada wanted to do business with Elliott-Delaware and not that Elliott-Canada had any desire to deal with businesses in Michigan.

In conclusion, we affirm the trial court's order dismissing Elliott-Canada as a party to this suit. In our opinion, the record fails to show any direct contacts with Michigan which can be imputed to Elliott-Canada. There is neither proof of a single, isolated business transaction by Elliott-Canada in Michigan out of which adverse consequences flowed within the state nor proof that Elliott-Canada conducts its business in such a way that, through a distribution or marketing scheme, it intends for and desires its products to be used within Michigan.

## II

The second issue for our consideration is whether the covenant not to sue Elliott-Delaware agreed to by Schreiber is effective. If so, plaintiff, as subrogee of Schreiber, is bound by the covenant and may not sue Elliott-Delaware. An insurer, as subrogee of its insured, has no greater rights against the tortfeasor than its insured. *Poynter v Aetna Casualty & Surety Co,* 13 Mich App 125, 128-129; 163 NW2d 716 (1968).

Plaintiff contends that the covenant not to sue, which was formally executed on September 7,

1979, cannot bar its suit against defendant because the covenant was executed after plaintiff paid Schreiber $75,000. Plaintiff relies on *Wolverine Ins Co v Klomparens,* 273 Mich 493; 263 NW2d 724 (1935). In that case, with knowledge of a settlement between the insurer and the insured, the tortfeasor made a further settlement with the insured and obtained a release from any further liability. The Supreme Court held that the release was ineffective as a fraud upon the insurer's rights and constituted no defense for the tortfeasor. *Id.,* 496.

We disagree that *Klomparens* has any applicability to this case. While it is true that the covenant not to sue was executed by Schreiber after it received payment from plaintiff, at the time Elliott-Delaware, Schreiber, and Union Gera agreed to settle this dispute, the alleged tortfeasor in issue, Elliott-Delaware, had no knowledge of any previous settlement between Schreiber and plaintiff. Indeed, it could not have had any such knowledge for the reason that no settlement had been effected. While we have uncovered no cases decided by a Michigan court which are directly applicable, we do note the following decisions holding that, where the insured settles with the tortfeasor before payment by the insurer, the latter's right of subrogation is lost. *International Ins Co v Medical-Professional Building of Corpus Christi,* 405 SW2d 867 (Tex Civ App, 1966), *Federal Ins Co v Plaza Drugs, Inc,* 333 F Supp 1305 (D DC, 1971).

Plaintiff confuses the date of the agreement with the date of execution of some aspect of the agreement. Here, Union Gera, Elliott-Delaware, and Schreiber agreed as early as June 13, 1978, that Elliott-Delaware would not be sued by Schreiber if

Elliott-Delaware agreed to assume one-third of the cost of a new boring mill and to provide further services relative to the set-up of the new machine. Schreiber's attorney's letter dated August 1, 1978, before plaintiff had paid Schreiber anything, stated in part that Schreiber agreed to execute a covenant not to sue in relation to the old machine. The fact that Schreiber did not fulfill its obligations pursuant to the agreement until after it received some payment from plaintiff in no way changes the fact that, at the time the agreement was made, plaintiff had paid Schreiber nothing. The following holding from *Hansen v Catsman,* 371 Mich 79, 82; 123 NW2d 265 (1963), is particularly germane to this case:

"It is well recognized that it is possible for parties to make an enforceable contract binding them to prepare and execute a subsequent agreement. In such a case, where agreement is expressed on all essential terms, the instrument is considered a contract, and is considered a mere memorial of the agreement already reached. 1 Corbin, Contracts, § 29. It is further to be noted, however, that 'If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called "contract to make a contract" is not a contract at all.' Corbin, *supra,* p 68. See, also, 6 MLP, Contract, § 27.

"As noted in 1 Restatement, Contracts, § 26, p 33:

" 'Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions.' "

See, also, *Professional Facilities Corp v Marks,* 373 Mich 673, 679; 131 NW2d 60 (1964).

Plaintiff contends, however, that Schreiber never intended for the letters of July 25 and August 1, 1978, to extend the covenant not to sue to business interruption losses. While we agree with plaintiff that these letters, which ultimately were executed by both parties as the written contract, are ambiguous as to the intended scope of the release, plaintiff presented no evidence contradicting the affidavit and deposition of Peter Manchur, Elliott-Delaware's agent, that the parties intended the covenant to relate to all potential claims against Elliott-Delaware. Schreiber's legal representative's affidavit does not contradict Manchur, and his subsequent execution of the covenant not to sue in respect to all claims for all losses is certainly strong evidence that the original agreement was properly embodied in the covenant not to sue.

Plaintiff implies that Schreiber's attorney, A. Albert Sugar, prepared the covenant not to sue in respect to all claims for fraudulent motives. Again, there is no record evidence to support this implication. Moreover, it is inherently unlikely that, after having received full performance from Elliott-Delaware of the settlement agreement, Sugar would have executed a covenant not to sue which was far broader than that actually agreed to. Undoubtedly, Sugar would have been aware of the potential problems the broad covenant not to sue might cause in respect to the insurance claim. Since plaintiff presented no evidence tending to show that the parties actually only agreed to a covenant not to sue in respect to the replacement of the machine itself, its theory is entirely speculative and insufficient to avoid a summary dismissal of its claim against Elliott-Delaware.

In summary, we believe that Elliott-Delaware and Schreiber entered into a valid settlement

agreement to dispose of a disputed claim. In exchange for Elliott-Delaware's agreement to assume one-third of the loss of the boring mill and other performance relating to the set-up of the new machine, Schreiber agreed to execute a covenant not to sue Elliott-Delaware for any and all losses arising out of the destruction of the machine.

Affirmed. Defendants-appellees may tax costs.

Danhof, C.J., concurred.

J. H. Gillis, J. *(dissenting).* I respectfully dissent. In my opinion, Elliott-Canada's sale of the boring mill to Elliott-Delaware with knowledge that it would be installed and operated in Michigan by plaintiff's subrogor constituted purposeful availment of the privilege of transacting business in the forum state, sufficient to create limited personal jurisdiction under MCL 600.715(2); MSA 27A.715(2).

It is well settled that a court may exercise personal jurisdiction over a nonresident defendant only if there exist "minimum contacts" between the defendant and the forum state. *International Shoe Co v Washington,* 326 US 310, 316; 66 S Ct 154; 90 L Ed 2d 95 (1945). Sufficient "minimum contacts" exist where a corporation "purposefully avails itself of the privilege of conducting activities within the forum State". *Hanson v Denckla,* 357 US 235, 253; 78 S Ct 1228; 2 L Ed 2d 1283 (1958), *Khalaf v Bankers & Shippers Ins Co,* 404 Mich 134, 148; 273 NW2d 811 (1978). A single transaction may be sufficient to meet the "minimum contacts" test. *Parish v Mertes,* 84 Mich App 336, 339; 269 NW2d 591 (1978).

The United States Supreme Court in *World-Wide Volkswagen Corp v Woodson,* 444 US 286; 100 S Ct 559; 62 L Ed 2d 490 (1980), held that

mere "foreseeability" that the defendant's product will cause harm in the forum state is insufficient to establish personal jurisdiction under the Due Process Clause. However, the Court's subsequent comments indicate that a defendant's affirmative act of marketing its product in the forum state will establish requisite "minimum contacts":

"This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.

                      *    *    *

"[I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, *but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States,* it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. *The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.* Compare *Gray v American Radiator & Standard Sanitary Corp,* 22 Ill 2d 432; 176 NE2d 761 (1961)." (Citations omitted; emphasis supplied.) 444 US 286, 297-298.

The Court also noted that the "mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State'". 444 US 286, 298, quoting *Hanson v Denckla, supra,* 253.

In the case at bar, the requisite contact arises

not from Schreiber's unilateral activity but from Elliott-Canada's affirmative act of contracting for the sale of the mill with actual knowledge that it would ultimately be operated in Michigan and could cause harm to persons in Michigan. Moreover, Elliott-Canada supplied personnel to install and inspect the mill at Schreiber's plant and was compensated by Elliott-Delaware, thereby receiving additional financial benefit from the sale of the product in Michigan.

The decisions in *Khalaf v Bankers & Shippers Ins Co, supra,* and *Hapner v Rolf Brauchli, Inc,* 404 Mich 160; 273 NW2d 822 (1978), do not preclude a finding of jurisdiction in this case. *Khalaf* involved a plaintiff who was injured while operating a press in Michigan. He commenced an action in Michigan against National Machine Service Co, Inc., an Illinois corporation, for negligence and breach of implied warranty in servicing the press. National's insurer, Bankers & Shippers Ins. Co., refused to defend on the ground that the policy issued to National did not cover the operations which resulted in plaintiff's injury. Plaintiff obtained a default judgment against National but was unable to collect. He then brought an action in Michigan against Bankers and the insurance agent who had procured the policy for National from Bankers, alleging negligence in such procurement. The question on appeal was whether the agent's procurement of insurance for National, a business whose operations he knew extended beyond Illinois, constituted "minimum contacts" sufficient for the exercise of jurisdiction by Michigan. There was no evidence in the case that the agent had ever transacted business in Michigan, nor was there evidence that National, apart from the activities that occasioned plaintiff's loss, ever did busi-

ness in Michigan. The Supreme Court held that the mere fact that the agent had reason to believe that National might do business at some indeterminate future time in some other state, possibly Michigan, and should reasonably have foreseen that negligent performance of his agreement to procure insurance could cause loss to a Michigan resident was insufficient to establish jurisdiction. The Court noted that:

"A different question might be presented on evidence that the insurance agent agreed to insure specific risks in the forum state or that he transacted substantial business for insureds located in the state." 404 Mich 134, 157.

In *Hapner v Rolf Brauchli, Inc, supra,* plaintiff was injured in Michigan by a hair dryer purchased in Illinois and manufactured by Solis Apparatus Manufactories, Ltd., a Swiss corporation. The question on appeal was whether Michigan had limited personal jurisdiction over Solis. The evidence established that Solis exported its products to the United States through independent exporters, none of which were located in Michigan. There was no evidence that Solis's products were in fact distributed in Michigan or that Solis had reason to believe they were distributed in Michigan. On these facts, a majority of Supreme Court justices held that Solis had not purposefully availed itself of the privilege of acting in the forum state, even though it was foreseeable that a purchaser might be a Michigan resident or might bring the product into Michigan.

In short, *Khalaf* and *Hapner* hold only that the foreseeability that a defendant's product or actions will cause harm or loss to Michigan residents does not constitute purposeful availment. I would hold

that, where, as here, a defendant places a product into the stream of commerce with knowledge that it will ultimately be sold in Michigan, it has purposefully availed itself of business opportunities in Michigan and is subject to personal jurisdiction in the state. See *Behlke v Metalmeccanica Plast, SPA v Danson Corp, Ltd,* 365 F Supp 272 (ED Mich, 1973), *Gray v American Radiator & Standard Sanitary Corp,* 22 Ill 2d 432; 176 NE2d 761 (1961).

I also dissent from the majority's finding as to issue II, upholding the trial court's grant of accelerated judgment in favor of Elliott-Delaware. The letters dated July 25, 1978, and August 1, 1978, which embody the settlement agreement between Schreiber and Elliott-Delaware, do not disclose whether the parties intended to settle all of Schreiber's claims, including the claim for business interruption losses or whether they intended to settle only the claim for replacement and installation costs. I believe there exists a material question of fact as to whether Schreiber's agreement to execute a covenant not to sue barred all of the claims in this lawsuit. I would find error in the grant of accelerated judgment to Elliott-Delaware.