**AG–CHEM EQUIPMENT CO., INC., a Minnesota corporation, on Behalf of its AGTEC DIVISION, Plaintiff,**

v.

**AVCO CORPORATION, a Delaware corporation, Stabilimenti Meccanici VM, S.p.A., an Italian corporation, d/b/a VM Group of America, Diesel Power Company, a Michigan corporation, and Engine Power Inc., a Wisconsin corporation, Defendants.**

**No. G86–37 CA1.**

United States District Court, W.D. Michigan, S.D.

July 24, 1987.

Miller, Johnson, Snell & Cummiskey by Craig H. Lubben, Grand Rapids, Mich., for AG–Chem Equipment Co., Inc.

Daniel P. Fay, Law Firm of Daniel P. Fay, S.C., Pewaukee, Wis., for Engine Power, Inc.

Richard E. Rassel, Darlene M. Domanik, Butzel Long Gust Kelin & Van Zile, Detroit, Mich., for Stabilimenti Meccanici, VM, S.p.A. and VM Group of America.

Smith, Haughey, Rice & Roegge by Thomas F. Blackwell, Grand Rapids, Mich., for Avco Corp.

## OPINION DENYING DEFENDANTS VM AND VMGA'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION.

HILLMAN, Chief Judge.

Plaintiff, Ag-Chem Equipment Company (Ag-Chem), a Minnesota corporation, brings this diversity suit, on behalf of its AgTec Division, to recover damages for economic injuries allegedly sustained as a result of the purchase of industrial diesel engines from defendants AVCO Corporation (AVCO) and its authorized sub-distributors Diesel Power Company (Diesel) and Engine Power, Inc. Plaintiff also sues the Italian manufacturer Stabilimenti Meccanici VM, S.P.A. (VM), and the manufacturer's representative for VM, VM Group of America (VMGA).[1] For the purposes of this motion only, VM admits that it manufactured the engines at issue.

Currently before the court is defendants VM and VMGA's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. For the reasons discussed below, defendants' motion is denied.[2]

## I. Factual Background

Plaintiff filed this action in January of 1986, alleging that its AgTec division had been solicited to purchase industrial air-

---

1. I would here make a note about my use of the names VM and VMGA. In its complaint, plaintiff alleges that VM is "doing business as" VMGA and treats them as a single defendant. In their first brief in support of the instant motion, VM and VMGA argue that they are "separate and distinct legal entities." (Brief in Support, April 17, 1986 at 14.) As far as I have been able to determine, VM and VMGA presented this argument for the purpose of contesting service of process by the plaintiff. That issue is now moot. Although defense briefs in support of the Rule 12(b)(2) motion nominally refer to VM and VMGA as separate entities, they in fact treat them as one for substantive purposes, forwarding identical arguments on their behalf. Therefore, although I occasionally make separate reference to VM and VMGA for the sake of factual clarity, I treat them as one for the purpose of this motion.

2. Since drafting this opinion, the court has received a supplemental brief opposing defendants' motion to dismiss and defendants' supplemental response. Although I have carefully considered the arguments contained in the latter, I remain convinced that VM and VMGA have the minimum contacts with Michigan necessary to allow this court to take personal jurisdiction under the due process clause. I would note, however, that I am somewhat puzzled as to why neither party has raised in those briefs the most recent United States Supreme Court case discussing minimum contacts, *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* —— U.S. ——, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

cooled diesel engines for installation in plaintiff's agricultural sprayers. The solicitation allegedly took place at plaintiff's plant in Niles, Michigan in February of 1982. Plaintiff asserts that AVCO and its subdistributor Diesel initiated the contact. AgTec subsequently shipped an agricultural sprayer without an engine to AVCO's plant in Houston, Texas. In the fall of 1982, AVCO installed a VM engine in the sprayer and returned it to AgTec with assurances of its workability. AgTec consequently bought six VM engines from Diesel between late 1982 and November 1983. In early 1984, it purchased two more engines from another AVCO distributor, Engine Power, Inc. AgTec installed six of the eight engines in sprayers that it sold to customers.

In mid–1983, AgTec began to receive complaints about these engines. It notified AVCO of the problems in late 1983. During this same period, AgTec received a letter stating that VMGA would be taking over the distribution of industrial diesel engines from AVCO. The letter was signed by Dale Chambliss, Director of VMGA, and John W. McClure of AVCO. (Reply to Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss and Quash Service of Process, May 14, 1986, ex G.)

In July, 1984, the president of plaintiff Ag-Chem telephoned Dale Chambliss at the VMGA office in Houston, Texas. Plaintiff sought VM's and VMGA's warranty of the diesel engines as installed by AVCO as well as their assistance in correcting the problems it had encountered with the VM diesel engines. VM and VMGA twice sent engineers to Niles, Michigan. The engineers made several suggestions, none of which resolved the problem. VM and VMGA subsequently refused to warrant the engine as installed.

## II. Standard of Review

Defendants VM and VMGA move to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Plaintiff carries the burden of establishing personal jurisdiction over defendants. *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th

Cir.1980). However, plaintiff need only make out a prima facie case for the assertion of personal jurisdiction over defendants where, as here, the court decides the issue on the basis of written materials. *Id.* Furthermore, the court is to consider documents concerning jurisdictional facts in the light most favorable to plaintiff. *Id.* at 439.

## III. Discussion

In determining whether it has personal jurisdiction over a non-resident defendant, a federal court sitting in diversity must undertake a two-part analysis. *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). First, the court must consider whether personal jurisdiction exists under the long-arm statute of the forum state. *Velandra v. Regie Nationale Des Usines Renault*, 336 F.2d 292, 294 (6th Cir.1964). Second, the court must consider whether the "exercise of personal jurisdiction is consistent with due process." *Scullin Steel Co. v. National Railway Utilization Corp.*, 676 F.2d 309, 312 (8th Cir. 1982).

In this case, the applicable Michigan long-arm statute specifies the following:

The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:

(1) The transaction of any business within the state ...

M.C.L.A. § 600.705(1).

Michigan courts have interpreted Section 600.705(1) to allow a court personal jurisdiction over nonresident defendants to the extent permissible under the due process clause of the fourteenth amendment. *City Suburban Agency, Inc. v. Dade Helicopter*

*Services, Inc.,* 141 Mich.App. 241, 366 N.W.2d 259 (1985). *See also Hertzberg & Noveck v. Spoon,* 681 F.2d 474, 478 (6th Cir.1982). Consequently, with respect to defendants' motion to dismiss, this court must only determine whether assertion of personal jurisdiction comports with due process.

In a series of cases beginning with *International Shoe Co. v. Washington, supra,* and extending through *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* —— U.S. ——, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the United States Supreme Court has outlined the due process limitations on in personam jurisdiction over nonresident defendants. "[T]he Constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985), citing *International Shoe, supra,* 326 U.S. at 316, 66 S.Ct. at 158. Existence of such contacts ensures that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe, supra,* at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278). It also "protects the defendant against the burdens of litigating in a distant or inconvenient forum" and "ensure[s] that the States, through their courts, do not reach beyond the limits imposed on them by their statutes as coequal sovereigns in a federal system." *World-Wide Volkswagon, supra,* 444 U.S. at 292, 100 S.Ct. at 564.

Based on these principles, the Sixth Circuit has adopted a three-part test for determining the constitutionality of exercising personal jurisdiction in any particular case. First, the defendant must have purposely availed himself of the privilege of acting in the forum state. Second, the cause of action must have arisen from the defendant's activities in the state. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable. *Chattanooga Corp. v.*

*Klingler,* 704 F.2d 903, 906 (6th Cir.1983), citing *Southern Machine v. Mohasco Industries, Inc.* 401 F.2d 374 (6th Cir.1968). The Sixth Circuit cautions that while the first two elements of its three-part test involve a search for the specific type of contacts which have been held to be essential to the maintenance of jurisdiction, the third demands flexibility and "an appraisal of the overall circumstances of each case." *In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 226 (6th Cir.1972).

In arguing that VM and VMGA purposefully availed themselves of the privilege of acting in Michigan or causing a consequence to take place in Michigan, plaintiff relies on the "stream-of-commerce" theory. That theory has been the subject of debate among Supreme Court justices as well as the circuit courts. Although all acknowledge its existence, there is disagreement regarding its definition.

The theory first received widespread attention in *World-Wide Volkswagon v. Woodson, supra.* In that case, the plaintiff sought "to base jurisdiction on one, isolated occurrence ... the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma." *Id.* 444 U.S. at 295, 100 S.Ct. at 566. The Supreme Court held that the possibility of an accident in Oklahoma, while to some extent foreseeable given the inherent mobility of automobiles, did not establish minimum contacts between the forum state and the retailer or distributor. However, the Court disclaimed the idea that "foreseeability is wholly irrelevant" to the determination of minimum contacts. *Id.* at 297, 100 S.Ct. at 567. It said, "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into Court there." *Id.*

To illustrate, the Court contrasted the foreseeability of litigation involving a product that a consumer fortuitously transports

into a state, which it said provided insufficient contact to give notice of the possibility of litigation, to the foreseeability of litigation in a state where the defendant's product is regularly sold, which it held provided sufficient notice. The Court stated:

> Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*Id.* at 297–98, 100 S.Ct. at 567.

Finally, the Court cited with approval the assertion of jurisdiction by the Illinois Supreme Court in *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961). In that stream-of-commerce case the defendant, over whom jurisdiction was asserted, was a component parts manufacturer that sold no components in Illinois but did sell them to a manufacturer who incorporated them into a final product sold in Illinois.

Most recently, the Supreme Court discussed the stream of commerce theory in *Asahi Metal Industries Co., Ltd. v. Superior Court of California, supra.* That case reflects the debate, both among the Justices and the circuits, over what exactly constitutes minimum contact via the stream-of-commerce. The Justices unanimously agreed that an assertion of jurisdiction over defendant Asahi, a Japanese manufacturer, would "offend traditional notions of fair play and substantial justice," *id.* 107 S.Ct. at 1033, the equivalent of the third prong of the three-part test of jurisdiction enunciated by the Sixth Circuit.

Thus, they dismissed the case. However, in applying the stream-of-commerce test to determine whether the defendant purposely availed itself of the privilege of acting in the forum state, the Court split.

Justice O'Connor, joined by Chief Justice Rehnquist and Justice Scalia, argued:

> The "substantial connection," *Burger King*, 471 U.S., at 475 [105 S.Ct. at 2184]; *McGee [v. International Life Ins. Co.]*, 355 U.S. [220], at 223 [78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)], between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. *Burger King, supra,* 471 U.S., at 476 [105 S.Ct. at 2184]; *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 [104 S.Ct. 1473, 1478, 79 L.Ed.2d 790] (1984). The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* 107 S.Ct. at 1033.

In contrast, Justice Brennan, joined by Justices White, Marshall and Blackmun, argued that there was no need for a showing of additional conduct. He states, "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* at 1035. According to Justice Brennan, a majority of the Circuits, including the Sixth, agree with this view.

Finally, Justice Stevens, while declining to analyze the stream-of-commerce argument, did state that whether placing an article into the stream-of-commerce amounts to minimum contacts "requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components." *Id.* at 1038. Justices White and Blackmun joined Justice Stevens's opinion.

Until the Supreme Court resolves the debate as to what constitutes minimum contacts under the stream-of-commerce theory, it is incumbent upon this court to follow the lead of Justice Brennan and the Sixth Circuit. *See Asahi, id.* at 1035–36 (citing *Poyner v. Erma Werke GMBH,* 618 F.2d 1186 (6th Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980)).

In *Poyner,* the Sixth Circuit found that a German corporation selling its products to a U.S. distributor had sufficient minimum contacts with Kentucky to allow a district court sitting in that state to assert personal jurisdiction over it. As a preliminary point, the court noted that use of an independent distributor that renders a manufacturer only indirectly responsible for the product reaching and injuring a consumer will not in itself insulate the non-resident foreign corporation from suit. *Poyner, supra,* at 1190 (citing *Eyerly Aircraft Co. v. Killian,* 414 F.2d 591 (5th Cir.1969)). The distributor engaged by the German corporation as its exclusive dealer, was located in New York. However, according to the court of appeals, it conducted nationwide advertising, sold the German products to a sub-distributor in Kentucky, had a salesman in Tennessee, and a warehouse in North Carolina, all of which were capable of servicing customers in Kentucky. The court further found that the distributor had solicited business in Kentucky through telephone calls and mail order catalogs. Citing the district court's finding that "Erma [the German corporation] was certainly aware of [its distributor's] efforts to sell its products," the Sixth Circuit held that the first part of the three-part analysis of constitutionality was satisfied. *Poyner, supra* at 1191.

In the case before me, VM engaged AVCO as its exclusive dealer for engines in the United States and Canada. In a written contract dated March 1, 1977, VM agreed to refer all inquiries regarding its engines to AVCO and to provide AVCO with an adequate number of catalogs, illustrated folders, and other promotional materials free of charge. (AVCO Corporation's Response to Plaintiff's Requests for Production of Documents, ex. 1 at 2.) It also agreed to guarantee all of its products by written warranty for a period of six months starting from the date of the sale to the end-user, provided a warranty card was filled out and returned to VM by AVCO, the subdistributor, or the end-user. (Id. at 3.) Furthermore, both AVCO and its subdistributors were authorized by VM to do field repairs and replacements, the cost of which would be credited to AVCO by VM, upon submission to VM of monthly reports itemizing such activity. (*Id.* at 4.) AVCO also agreed to supply VM with an annually updated list of all of its subdistributors. (*Id.* at 2.) In August of 1982, AVCO and VM executed a second contract which was identical with respect to the benefits and obligations described above. (*Id.* exs. 2 and 3.)

In light of these contract provisions, I must conclude that VM knew that AVCO's efforts to sell its products included attempts to sell in Michigan. When AVCO and Diesel Power Company solicited AgTec's business, AVCO supplied AgTec with a then current list of 59 distributors. The list is organized alphabetically by distributor's name and according to the state in which the distributor is located. It includes two distributors located in Michigan, one in Ohio, and one in Wisconsin. (Reply to Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss and Quash Service of Process, May 14, 1986, ex. A.) Under both the 1977 and 1982 contract, AVCO was obligated to supply VM with annual updates of its distributor list. Given that fact, I can only conclude that under the standard enunciated in *Poyner* and advocated by Justice Brennan, it must have been foreseeable to VM that either the Michigan, Ohio, or Wisconsin distributors

would sell engines to customers in Michigan. VM cannot argue that when it placed its engines into the stream-of-commerce by selling to AVCO, it did not know that it was availing itself of the privilege of acting in Michigan or of causing a consequence there.

Even were I to apply the stream-of-commerce test enunciated by Justice O'Connor, I would conclude that VM purposefully availed itself of the privilege of acting in Michigan. In addition to a finding that defendant was aware that "the stream of commerce may or will sweep the product into the forum State," Justice O'Connor's standard requires that plaintiff show additional conduct by defendant "indicat[ing] an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi, supra,* 107 S.Ct. at 1033. AVCO's contractual obligation to market VM engines nationwide, as well as its promise to provide VM with annually updated lists of its distributors, and the fact that it had distributors in and near Michigan at the time that it sold engines to AgTec, together with the arrangement making AVCO the exclusive marketer of VM engines, makes it unmistakably clear that VM knew and intended that its engines be swept into Michigan when it placed them in the stream-of-commerce.

Were these facts not enough to meet Justice O'Connor's standard, VM and VMGA's knowledge that the engines would be marketed by a Michigan subdistributor combined with the agreement to warrant its engines to end-users as well as its promise to credit AVCO for any repairs that it made to engines owned by end-users, provides additional evidence of VM and VMGA's purposeful availment of the Michigan market. VM's involvement in the sale of its engines did not stop at the moment it passed them on to AVCO. It continued through solicitation of customers, sale, and even the first six months of operation by end-users. Under any of the enunciated definitions, I am satisfied that defendants' contacts with Michigan satisfy the first prong of the Sixth Circuit test.

I am also satisfied that the second prong of the test, that plaintiff's cause of action arise from the defendants' actions in Michigan, *Chattanooga, supra,* at 906, is satisfied. AgTec's cause of action arises out of the alleged malfunctioning of VM engines that AgTec bought in Michigan from Michigan and Wisconsin subdistributors.

Finally, VM and VMGA meet the last and most flexible prong of the Sixth Circuit test. Weighing the burden on the defendants, the interests of the forum state, the plaintiff's interest in obtaining relief, and the judicial concern with efficient resolution of controversies, I am satisfied that the acts of defendants and the consequences they caused have a substantial enough connection with Michigan to make the exercise of jurisdiction reasonable. *Id.* In this regard, VM and VMGA stand in sharp contrast to the defendants in *Asahi,* over whom, on the basis of this third criteria, the Supreme Court held California could not assert jurisdiction. The Asahi defendant, a Japanese manufacturer, sold valve assemblies to a Taiwanese manufacturer of tire tubes. *Asahi, supra,* 107 S.Ct. at 1029. The Taiwanese manufacturer was the defendant in a product liability action brought in California by a plaintiff injured when the tire on his motorcycle exploded. The Taiwanese manufacturer filed a cross-complaint against the Japanese manufacturer. But before the case reached trial, the plaintiff and the Taiwanese manufacturer settled. Only the Taiwanese defendant's indemnity suit was pending when the Supreme Court held that California was an unreasonable forum. The Court concluded that because the third-party defendant was not a California resident, the state's interest in the suit was slight and did not justify the substantial burden that a California suit would place on a Japanese manufacturer who never sold any of the goods at issue to anyone in the United States. *Id.* at 1033.

Here, the plaintiff is a Michigan resident, one defendant sold products to a U.S. Distributor, and the other is located in the United States. Furthermore, having extended a warranty to end-users who submit the appropriate registration card and knowing that AVCO had subdistributors located in and near Michigan, VM cannot argue that Michigan is an unreasonably distant or inconvenient forum for litigation. If it were, VM would not have extended end-user warranties. Furthermore, since 1983, VM and VMGA have jointly marketed VM diesel engines via regional offices, one of which they specifically designated to cover the Michigan market. (Reply to Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss and Quash Service of Process at ex. G.) This not only demonstrates the minimal burden that litigation in Michigan would place on defendants, it also increases Michigan's interests in resolving this dispute since sales originating at VM and VMGA's regional office are likely to continue to have an impact on Michigan residents.

Finally, the plaintiff's interests as well as concern with judicial economy weigh in favor of an assertion of jurisdiction. Michigan is the most logical, if not the only, forum in which plaintiff could sue the subdistributors who supplied the product. Were it not allowed to pursue simultaneously its action against all defendants, valuable judicial resources would likely be needlessly expended in duplicative litigation.

### IV. Conclusion

For the reasons stated above, defendants' motion to dismiss pursuant to Rule 12(b)(2) is denied.