**ANDREWS UNIVERSITY, a Michigan non-profit educational corporation, Plaintiff,**

v.

**ROBERT BELL INDUSTRIES, LTD., a foreign corporation, K.M.W., Inc., a foreign corporation, K.M.W. Systems, Inc., a foreign corporation, Kone Wood Ltd., a foreign corporation, Defendants.**

No. K87–117.

United States District Court, W.D. Michigan.

Jan. 27, 1988.

Boothby, Ziprick & Yingst by Robert A. Yingst, Berrien Springs, Mich., for plaintiff.

Miller, Canfield, Paddock & Stone by Ronald E. Baylor, Kalamazoo, Mich., for defendant Robert Bell Industries.

James Dark & Brill by Arthur W. Brill, Kalamazoo, Mich., for defendants K.M.W., Inc., K.M.W. Systems, Inc. and Jone Wood Ltd.

## OPINION

ENSLEN, District Judge.

Plaintiff Andrews University ("Andrews") is a private non-profit institution located in Berrien Springs, Michigan. Defendant K.M.W., Inc. (KMW) is a foreign corporation with offices in Ontario, Canada and Atlanta, Georgia. Defendant Robert Bell Industries, Ltd. ("Bell") is a manufacturer of boilers and related accessories. Bell's principal—and apparently its sole—place of business is Seaforth, Ontario, Canada. Plaintiff invokes diversity jurisdiction pursuant to 28 U.S.C. § 1332.

In April 1984, KMW purchased a fire-box boiler (the "boiler") from Bell "F.O.B. shipping point." *See* Purchase Order, Ex. 1 attached to Affidavit of Charles C. Smith. KMW took possession of the boiler at Bell's place of business in Canada. The complaint asserts that Andrews purchased the boiler from KMW and that the boiler was installed at Andrews in Berrien Springs, Michigan, in August, 1984. The complaint further asserts that the boiler became operational in October 1984. *See* Complaint at ¶¶ 6–8.

In 1985 a boiler located in North Carolina—a model from the same series sold to Andrews—developed a crack. Thereafter, a series of events unfolded in which eventually the Michigan Department of Labor declared the Andrews boiler unacceptable. At this point there was correspondence between Andrews and Bell. Bell attempted to assist Andrews in persuading the Michigan Department of Labor to rescind its ruling suspending operation of the boiler. *See* C.B. Smith letter of June 12, 1986 attached as Ex. 5 to plaintiff's motion in opposition to motion to dismiss. Bell also worked with Andrews in developing a proposal involving "the contingent replacement of the boiler...." *See* Letter of June 16, 1986 attached as Ex. 7 to plaintiff's motion in opposition. *See also* Letter of June 19, 1986, attached as Ex. 8, *supra.*

On March 25, 1987, Andrews filed a three (3) count complaint against KMW and Bell. Count 1 is brought solely against KMW and claims "breach of contract." Counts II and III are asserted against both

KMW and Bell and allege "breach of warranty" and "negligence" respectively. The matter is presently before the Court on defendant Bell's motion to dismiss and quash service pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

*Introduction*

This motion requires the Court to interpret the proper reach of Michigan's so-called "long-arm statute." Defendant Bell asserts that: 1) it lacks sufficient contacts with the State of Michigan to permit this Court to exercise *in personam* jurisdiction pursuant to Michigan's jurisdictional statutory requirements (See M.C.L. § 600.711; M.S.A. § 27A.711 and M.C.L. § 600.715); and 2) any exercise of the Court's *in personam* jurisdiction over it would violate the due process clause of the fourteenth amendment.

When presented with a motion to dismiss for lack of personal jurisdiction, a court's inquiry is really two-fold. First, it must determine whether personal jurisdiction exists in accordance with the statutory requirements of the forum state. Second, a court must determine whether the exercise of personal jurisdiction comports with due process. Recent decisions of the Supreme Court have somewhat conflated the analysis in states where the statutory requirements appear to be coextensive with what is permitted under the due process clause. Moreover, it is clear that Michigan courts generally interpret Michigan's long-arm statutes to permit personal jurisdiction over nonresident defendants to the extent permissible under the due process clause of the fourteenth amendment. *See e.g., City Suburban Agency, Inc. v. Dade Helicopter Services, Inc.,* 141 Mich.App. 241, 366 N.W. 2d 259 (1985). *Ag–Chem Equip. Co. v. Avco Corp.,* 666 F.Supp. 1010 (W.D.Mich. 1987) (noting the conflation of the two inquiries under Michigan law and holding that the court need only determine whether assertion of personal jurisdiction comports with due process). Nevertheless, because the parties have argued both prongs of the test and because the two-part test aids in the factual presentation and legal analysis,

I will analyze this case under both "prongs."

*Standard of Review*

█ It is plaintiff's burden to establish the existence of personal jurisdiction over the defendant. *Welsh v. Gibbs,* 631 F.2d 436, 438 (6th Cir.1980). Where the court finds that there are no issues of credibility or disputed issues of fact, it may decide the motion on the basis of written materials. The Sixth Circuit has indicated that in such circumstances plaintiff's burden of making out a *prima facie* case is relatively slight. Further, a court must interpret the pleadings and affidavits in the light most favorable to the plaintiff. *Id.* In addition, a court must consider documents concerning jurisdictional facts in the light most favorable to the plaintiff.

*Discussion*

*Due Process Requirements*

More than forty years ago the Supreme Court held that a state may not exercise personal jurisdiction over a nonresident corporate defendant unless the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed.2d 95 (1945) at 316, 66 S.Ct. at 158 (*quoting Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). In 1980, the Supreme Court revisited *Shoe* and held that a court's assertion of jurisdiction must be both reasonable and based on the existence of minimum contacts between the defendant and the forum state. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–292, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980). In *Burger King Cor. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985), citing *International Shoe, supra* 326 U.S. at 316, 66 S.Ct. at 158, the Court noted that "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum state."

More recently, in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107

S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Supreme Court again had occasion to interpret the requirements of *Shoe* and to address the so-called "stream of commerce" theory. The *Asahi* Court unanimously agreed that an assertion of jurisdiction over defendant *Asahi*, a Japanese corporation which had supplied the manufacturer with component parts in Taiwan, would "offend traditional notion of fair play and substantial justice," *supra*, 480 U.S. at ——, 107 S.Ct. at 1035, 94 L.Ed.2d at 107. The main claim in *Asahi* involved a products liability action brought in a California court. The plaintiff in that action claimed that a tire tube manufactured by a Taiwan corporation was defective and its malfunction had caused his motorcycle to collide with a tractor. The manufacturer settled and brought an indemnity action against *Asahi*. The California Supreme Court reversed the California Court of Appeals which had issued a preemptory writ of mandate commanding the Superior Court to quash service of summons. The California Supreme Court found that *Asahi* had indirectly benefited from the sale in California of products incorporating its components. Moreover, it found that jurisdiction did not offend due process in that Asahi had intentionally placed its component parts in the stream of commerce and that Asahi was aware that some of the components would eventually find their way to California.

In reversing the California Supreme Court, Justice O'Connor's plurality opinion indicated that a " 'substantial connection[ ]' between the defendant and the forum state [is] necessary for a finding of minimum contacts," and that such connection "must come about by an action of the defendant purposefully directed toward the forum State." *Id.*, 480 U.S. at ——, 107 S.Ct. at 1033, 94 L.Ed.2d at 104 (original emphasis). The O'Connor plurality emphasized that it disagreed with the "foreseeability test" set forth in other jurisdictions. Put differently, the four-justice plurality noted that a defendant does not establish minimum contacts with a forum state unless it engages in "[a]dditional conduct" beyond that of merely placing products in the stream of commerce with the knowledge that the products will eventually find their way into the forum state. *Id.*, 480 U.S. at ——, 107 S.Ct. at 1033–34, 94 L.Ed.2d at 103–104.

Justice Brennan concurred in part and in the judgment but wrote a separate opinion, joined in by Justices White, Marshall and Blackmun, disagreeing with Justice O'Connor's analytical approach to the stream-of-commerce theory. Justice Brennan modified the foreseeability test he had previously set forth in his dissent in *Volkswagen* and indicated that he would permit jurisdiction where a defendant knows its products are being marketed in the forum state. Put differently, Justice Brennan's concurrence highlighted the difference between the fortuitous transporting of a product and a foreseeable one. Justice Brennan noted that "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* 480 U.S. at ——, 107 S.Ct. at 1035, 94 L.Ed.2d at 107. Justice Brennan emphasized that Asahi made regular and extensive sales of its components.

Justice Stevens wrote a separate concurrence, joined by Justices White and Blackmun, stating that because jurisdiction would be "unreasonable and unfair" under *Volkswagen*, the Court need not address the minimum contacts issue. Justice Stevens noted that he did not agree with the Court's [apparent] assumption that "an unwavering line can be drawn between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market." *Id.* 480 U.S. at ——, 107 S.Ct. at 1038, 94 L.Ed.2d at 111. Justice Stevens did suggest, however, that in determining whether the placing an article into the stream-of-commerce amounts to minimum contacts "requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components." *Id.*

As the parties have recognized in their briefs, the *Asahi* Court was deeply split with respect to the question of what constitutes minimum contacts under the so-called "stream-of-commerce" analysis. *Cf. Ag-Chem Equip. Co., supra,* at 1014 (noting the split and arguing that "until the Supreme Court resolves the debate as to what constitutes minimum contacts under the stream-of-commerce theory, it is incumbent upon this court to follow the lead of Justice Brennan and the Sixth Circuit."). Justice Brennan placed *Poyner v. Erma Werke GMBH,* 618 F.2d 1186 (6th Cir.1980), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) among those cases supporting the stream-of-commerce" theory as opposed to the line of cases which requires some action of the defendant "purposefully directed toward the forum State"—the view presented in the plurality opinion written by Justice O'Connor. In this instance, however, the "proper" classification of the *Poyner* decision does not provide me with much guidance in that the parties hotly dispute precisely what *Poyner* requires in terms of minimum contacts. I will examine *Poyner* in more detail later. More important, because *Asahi* itself did not settle the "stream of commerce/minimum contacts dispute," *Poyner* is of marginal help in resolving that issue.

Finally, it is not clear that the solution proposed by *Ag-Chem* of "following the lead of the Brennan concurrence and the Sixth Circuit" is completely satisfactory either. For example, in a somewhat different factual context, the Sixth Circuit, in *Local 670 v. Int. U., United Rubber, Etc., Workers,* 822 F.2d 613 (6th Cir.1987), recently cited *Asahi* and appeared to rely on the O'Connor analysis. *Local 670* framed the jurisdictional issue before it in terms of whether a defendant had *"purposefully availed itself of the privilege of conducting activities in the forum state." Local 670,* 822 F.2d at 621 (emphasis added).

The Sixth Circuit has established a three-part test to determine whether a finding that a non-resident company transacts business within the forum state comports with the requirements of the due process clause.

First, the defendant must purposely avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Co. v. Mohasco Industries Inc.,* 401 F.2d 374, 381 (6th Cir.1968). *Accord Chattanooga Corp. v. Klingler,* 704 F.2d 903 at 905–906 (6th Cir.1983); *First National Bank v. J.W. Brewer Tire Co.,* 680 F.2d 1123, 1125–1126 (6th Cir. 1982).

I believe that this test actually encompasses the various policy concerns articulated in the separate *Asahi* opinions, inasmuch as the common denominator of the plurality and concurring opinions appears to be whether personal jurisdiction is "reasonable" under the facts presented. Nonetheless, it is clear that even where a court finds that jurisdiction is "reasonable," under *International Shoe* it still must determine whether or not "minimum contacts" exist. This latter inquiry appears to require that some activity be directed toward the forum state. Moreover, the language of the first part of the *Mohasco* test incorporates that requirement.

The problem with plaintiff's analysis is that it focuses on what is "reasonable" but glosses over the minimum contacts requirement. Plaintiff argues in the main that it is reasonable and fair to require defendant Bell to defend this suit primarily because of the interest it has shown in protecting its business reputation, but plaintiff does not adequately establish the "minimum contacts" requirement with respect to the cause of action currently before this Court.

*Michigan's Statutory Requirements*

It is undisputed that general personal jurisdiction may be found where a defendant has carried on a "continuous and systematic" part of its general business in Michigan even where the cause of action arises out of the defendant's non-Michigan-

related activities. M.C.L. § 600.711 provides in pertinent part:

> The existence of any of the following relationships between a corporation and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise general personal jurisdiction over [the] corporation and to enable such courts to render personal judgments against [the] corporation.
>
> . . . .
>
> (3) The carrying on of a continuous and systematic part of its general business within the state.

Limited personal jurisdiction, on the other hand, may be founded upon a single act or series of acts where the cause of action arises from the defendant's "Michigan-related" activities. M.C.L. § 600.715 provides in pertinent part:

> The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:
>
> 1) The transaction of any business within the state.
>
> 2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

### Due Process Requirements Revisited

■ Michigan courts interpret Michigan's long arm statute as extending a court's *in personam* jurisdiction over a non-resident defendant to the extent permissible under the due process clause of the fourteenth amendment. *See also Sifers v. Horen*, 385 Mich. 195, 188 N.W.2d 623 (1971).

Plaintiff is apparently arguing that its cause of action against Bell arises out of either 1) Bell's "transaction of business" ... in Michigan or 2) Bell's "doing or caus-

ing [an] act to be done" in Michigan resulting in an action for tort.

It is undisputed that KMW purchased a boiler from Bell and took possession of the boiler at Bell's place of business in Seaforth, Ontario on August 2, 1984. *See* Affidavit of Charles C. Smith ("Smith Aff.") at ¶ 4. It is also clear that Andrews purchased the boiler from KMW. Smith Supp. Aff. at ¶ 2. The Smith supplemental affidavit also establishes that Bell did not install or participate in the installation of the boiler sold to KMW but did send a nameplate and a boiler part to Andrews for installation by KMW when requested to do so by KMW. Smith Supp. Aff. at ¶ 4. Plaintiff asserts that the boiler became operational on October 19, 1984 and that the boiler is now "defective." See Complaint at ¶¶ 6, 8, & 11.

There is no evidence that KMW sold the original to Andrews, nor is there any allegation that any pre-sale negotiations took place between Bell and Andrews. Similarly, there are no allegations that Bell shipped the boiler to Andrews. It was originally alleged that Bell "installed" the boiler, but plaintiff has not rebutted the assertions in paragraph four of the supplemental Smith affidavit as set forth above.

Bell concedes that it had numerous discussions with Andrews and the State of Michigan concerning resolution of Andrews's alleged boiler problems and did send a price list for replacement boilers and offered to replace the boiler at a substantially reduced cost. However, Bell argues that none of these contacts with Andrews of the State occurred until *after* the alleged boiler "defect" was asserted. *See* Smith Supp.Aff. at ¶ 5. Defendant Bell argues that such "after the fact" contacts cannot —either as a matter of logic or as a matter of law—provide a basis for personal jurisdiction. Under these facts, the Court agrees.

Defendant Bell admits to having sold three small boilers—apparently of a different type—to Michigan customers between 1972 and 1982. *See* Smith Supp.Aff. at ¶ 7. However, Bell argues that these sales were unsolicited and were made on the basis of

purchase orders received in Seaforth, Ontario. *Id.* Moreover, after the boilers were manufactured, they were shipped F.O.B. Seaforth. *Id.* Bell asserts that it had no business activities with any persons in Michigan prior to the problems which arose after it sold the boiler at issue here to KMW—except for "communications concerning the sale of the ... [previously mentioned] three boilers between the years 1972 and 1982." *See* Smith Supp.Aff. at ¶ 8.

Bell argues that the unsolicited sale of three boilers in Michigan between 1972 and 1982 does not constitute sufficient "minimum contacts" to create a "substantial connection" between Bell and Michigan so as to confer general personal jurisdiction upon this Court. Moreover, Bell argues that three sporadic, unsolicited sales do not rise to the level of "systematic and continuous" business activity in Michigan. Bell argues that any contacts with Michigan which occurred after the alleged problems arose should not be considered in the "minimum contacts" calculus. *Cf. Devalut of Delaware v. Omaha Public Power District*, 633 F.Supp. 374, 377 (E.D.Pa.1986) (holding visits to forum state by defendant to resolve contact dispute should not in and of themselves be determinative of personal jurisdiction).

In sum, Bell argues that it is undisputed that Bell 1) has never registered to do business in Michigan; 2) has never had any offices, agents, or employees in Michigan; 3) does not own or maintain any assets, accounts, or property in Michigan; 4) has never advertised in Michigan publications or disseminated advertising of any kind in Michigan; 5) has never solicited business in Michigan or had a marketing system to promote its products in Michigan; 6) has never maintained a system for distributing its products in Michigan or sold its products through distributors who have agreed to act as agents in Michigan; and 7) has in the last fifteen years sold only three boilers directly to customers in Michigan. *See* Defendant Bell's Brief in Support of Motion to Dismiss at 8–9.

Bell further asserts that the alleged "tortious acts" took place, if at all, in Canada, not in Michigan, and emphasizes that the complaint alleges that the boiler was negligently designed and manufactured and does not allege any injury to person or property, but merely argues that the boiler is not usable in Michigan. Bell concludes that Andrews's cause of action against it does not arise from any activity by Bell and that Bell does not have a substantial enough connection with Michigan to make the exercise of jurisdiction reasonable. Similarly, Bell argues that based on the facts as set forth above, it has not purposefully availed itself of acting or causing a consequence in Michigan. Put differently, Bell argues that Andrews has met none of the factors set forth in *Mohasco, supra.*

Plaintiff Andrews asserts that its lawsuit involves the manufacture and sale of a "defective" boiler which the Michigan Department of Labor determined to be not constructed in accordance with the American Society of Mechanical Engineers Boiler and Vessel Code ("ASME").[1] Michigan requires compliance with the ASME Code. *See* Ex. 1 at 2, Notice of Violation attached to Plaintiff's Brief in Support of Opposition to Motion to Dismiss. Plaintiff argues that Bell, through Mr. Smith, sought from the State of Michigan "a copy of [Michigan's]

---

1. The American Society of Mechanical Engineers ("ASME") is a non-profit membership corporation which is based in New York. Organized in 1880, ASME currently has some 90,000 members. The Society engages in educational and research programs in addition to publishing a mechanical engineering magazine. ASME also publishes some four hundred (400) codes and standards "which while only advisory, have a powerful influence: federal regulations have incorporated many of them by reference, as have the laws of most States, the ordinances of major cities, and the laws of all the Provinces of Canada." *See American Soc. of M.E.'s v. Hydrolevel Corp.*, 456 U.S. 556, 559, 102 S.Ct. 1935, 1939, 72 L.Ed.2d 330 (1982).

The Boiler and Pressure Code involved here is one of the many standards set by ASME. It appears that these particular codes have been adopted by forty-six (46) states and all but one of the Canadian Provinces. *Id.* The fact that defendant Bell builds its boilers to ASME specifications does not, without more, establish that it has "designed its product for market in the forum state" within the meaning of *Asahi.*

statutes and regulations when they are available so that we may update out files." *See* Ex. 10 Letter from C.B. Smith to Department of Labor dated August 23, 1985 attached to Plaintiff's Motion in Opposition to Motion to Dismiss.

Plaintiff argues that Bell sold a product which Bell represented to be constructed in accordance with manufacturing codes applicable in the United States. Plaintiff argues further that defendant not only anticipated but cultivated "regulation" inasmuch as it has asserted that it has enjoyed a good reputation in the United States for "nearly a century." *See* letter of Attorney Peter Ellsworth dated June 6, 1986 addressed to the Michigan Bureau of Construction Codes Boiler Division attached as Ex. 2 to Plaintiff's Brief in Support of Motion in Opposition. Finally, plaintiff argues that "Mr. Ellsworth's letter singing the praises of the products as having high reputation through the United States certainly raises more than a passing inference that Robert Bell Industries solicited business in this state." Plaintiff's Brief at 7.

Plaintiff argues that even under the "narrow test" set forth by the plurality in *Asahi*, "Robert Bell Industries, by its own correspondence and conduct, was engaged in conduct purposefully directed toward the State of Michigan." *See* Plaintiff's Brief in Opposition at 7. However, the problem with that argument, as defendant has pointed out, is that the correspondence alluded to took place after the sale of the boiler to KMW and even after the resale to Andrews.

Plaintiff argues further that *Asahi* can be distinguished on its facts. *Asahi* involved an indemnity action by a corporation that manufactured valve assemblies, while this case involves a "large, expensive, and potentially dangerous device." Plaintiff's Brief at 7. Plaintiff urges this Court to apply the gloss which Justice Steven's concurring opinion placed on the "purposefully availment" standard of "minimum contacts." Again, Justice Stevens noted "whether or not ... conduct rises to the level of purposeful availment requires a constitutional determination that is affect-

ed by the volume, the value, and the hazardous character of the components." *Asahi*, 480 U.S. ——, 107 S.Ct. at 1038, 94 L.Ed.2d at 111.

The Court concedes that it finds some wisdom in Justice Steven's assertion that it is difficult to draw a line between " 'mere awareness' that a component will find its way into the forum State and the notion of 'purposeful availment' of the forum's market." *Id.* 480 U.S. at ——, 107 S.Ct. at 1038, 94 L.Ed.2d at 111. Still, it is within the specific context of the component manufacturer, the fact situation presented in *Asahi*, that Justice Stevens offered his addendum to the "purposefully availing" requirement. Further, the fact that a corporation may manufacture boilers as opposed to component parts does not of itself resolve the issue of "minimum contacts."

Plaintiff argues that Michigan, as the forum state, has a keen interest in exercising jurisdiction over corporations which manufacture potentially dangerous items. Moreover, plaintiff argues that defendant Bell "negotiated with Andrews and state officials concerning correction of its defective device." Plaintiff's Brief in Opposition at 9. Again, while it is true that it appears that Michigan's interest in suits against manufacturers of dangerous or potentially dangerous products would be a strong one, that factor of "reasonableness" is only one of the factors which a court must look at under the three-part test laid out in *Mohasco*. Further, plaintiff's "negotiation argument" is misplaced in that those contacts all took place "after the fact."

Plaintiff's reliance on *Northern Ins. Co. v. Elliott, Ltd.*, 117 Mich.App. 308, 323 N.W.2d 683 (1982) in this regard is also misplaced. In *Northern*, the court actually held that the defendant Canadian manufacturer was not subjected to limited personal jurisdiction in Michigan where one of its employees was eventually sent to inspect the installation of a boring mill which had been sold to a Michigan customer by a domestic corporation. The Canadian manufacturer loaned an employee to a Delaware corporation which was obligated under a sales contract to inspect the allegedly

faulty installation. The court noted that the Canadian manufacturer's contract with the domestic (Delaware) corporation for the boring mill, "even knowing that the machine would be used in Michigan, did not show a 'purposeful availment' of business opportunities in Michigan." *Northern*, 117 Mich.App. at 323, 323 N.W.2d 683.

The *Northern* court did *suggest* that under some circumstances an act of inspection by a Canadian manufacturer—*properly attributed to such manufacturer*—"could constitute a 'purposeful availment' of opportunities" in Michigan. *Id.* at 317, 323 N.W.2d 683. *Cf. Khalaf v. Bankers & Shippers Ins. Co.*, 404 Mich. 134, 153–154, 273 N.W.2d 811 (1978) ("A 'purposeful availment' is something akin either to a deliberate undertaking to do or cause an act or thing to be done in Michigan or *conduct which can be properly regarded as a prime generating cause of the effects resulting in Michigan,* something more than a passive availment of Michigan opportunities. The defendant will have a reason to foresee being 'hailed before' a Michigan court.") (emphasis added).

Of course, the issue of whether a post-contract inspection which was not part of the original sales contract could of itself establish personal jurisdiction was not before the court in *Northern*. Moreover, in the case before me, an inspection visit was never an integral part of any sales contract of which defendant Bell and plaintiff Andrews were parties. Further, in *Northern*, the Canadian manufacturer and the domestic manufacturer had some common officers, yet they were considered separate corporate entities. No similar connection has been alleged between defendant Bell and defendant KMW. In sum, *Northern* is of little help to plaintiff here.

The Court believes that the situation would be different if Bell had first sent agents to Michigan or had agreed as part of some sales contract to Andrews to inspect the boiler in Michigan. Similarly, a different situation would present itself if Bell had first sent an agent to Michigan and then sought legal counsel there "after the fact." *Cf. McPheron, Inc. v. Koning,*

125 Mich.App. 325, 336 N.W.2d 474 (1983). In *McPheron*, the Michigan Court of Appeals did hold that the voluntary seeking of legal counsel satisfied the minimum contacts requirement. However, the *McPheron* court noted that it was important that the defendant had made the initial contact in seeking legal services to be rendered in the forum state and that the defendant had previously sent an agent to the forum state to complete a trade arrangement. It was "this presence [of the agent] and actions connected with it, [which] gave rise to the need for plaintiff's legal services." *McPheron*, 125 Mich.App. at 332, 336 N.W. 2d 474. *See also Sifers v. Horen*, 385 Mich. 195, 188 N.W.2d 623 (1971) (holding negotiations which took place in Michigan and which resulted in the defendant's retainer fell within the concept of transacting any business as set forth in the Michigan long-arm statute).

The situation would also be different if Bell had a marketing or distribution system or in some other way promoted its products in Michigan. But the affidavit of C.B. Smith asserts that Bell does not and has not "had a marketing system for promotion of its products in the State of Michigan; ... had a system for distribution of its products in ... the State of Michigan; or marketed or sold its products through distributors who have agreed to act as agents for or in the State of Michigan." *See* Aff. of Smith at ¶ 9.

The Michigan Supreme Court has stated that "a manufacturer's marketing system is generally seen as purposeful availment of the privilege of acting in a forum in which it has reason to know its products are distributed pursuant to that system." *Hapner v. Rolf Brauchi, Inc.*, 404 Mich. 160, 169, 273 N.W.2d 822 (1978). The *Hapner* court cautioned, however, that:

Proof alone that a non-resident caused an effect in Michigan that was foreseeable does not establish a relationship to Michigan such as to make it fair and reasonable to subject the non-resident to jurisdiction. (citation omitted)

Unless products of the manufacturer are distributed in this statute pursuant to its

marketing system in such a manner and to such an extent that it can properly be said that the manufacturer has 'purposefully avail[ed] itself of the privilege of conducting activities' within the state, it does not ordinarily have 'substantial connection' or requisite minimum contacts with the state justifying the exercise of long arm jurisdiction.

*Id.* at 168–169, 273 N.W.2d 822. *Accord Khalaf v. Bankers & Shippers, Inc.*, 404 Mich. 134, 153–154; 273 N.W.3d 811 (1978); *see also Northern Ins. Co. of New York v. Elliott, Ltd.*, 117 Mich.App. 308, 323, 323 N.W.2d 683 (1982) ("*Hapner* supports the conclusion that a corporation whose business is dependent on extensive multistate or multinational distribution networks may nonetheless fall within the ambit of *Khalaf* so long as said corporation's products are not distributed pursuant to a marketing scheme evincing 'purposeful availment' of the privilege of transacting business inside the forum.")

*Hapner* involved the question of whether a Swiss manufacturer of a hair dryer was subject to Michigan's long-arm statute where the defendant-manufacturer had sold its products to importers located in New York, Chicago, and Los Angeles. The plaintiff was severely burned by a defective hair dryer which was purchased in Illinois. The Illinois importer-wholesaler as well as a Chicago distributor were also named as defendants. The trial court, noting the question to be a "very close one," found that the defendant manufacturer lacked the requisite minimum contacts. Put differently, the trial court found that Michigan could not exercise personal jurisdiction without violating the due process clause.

The Court of Appeals reversed and remanded. The Michigan Supreme Court then reversed the Court of Appeals and remanded so that the trial court could make a determination as to the existence of a marketing system. Although the plurality opinion found that the marketing system used by the defendant manufacturer did not constitute purposeful availment, it noted that the manufacturer's products had been extensively distributed in the state

and that the failure of proof was "inadvertent and insubstantial." It is worth noting that the *Hapner* court was almost as badly divided as *Asahi* in reaching its conclusion. The plurality opinion acknowledged that the law with respect to long-arm jurisdiction was unsettled. The concurring opinion would have simply found no purposeful availment and would not have gone outside the record in ordering a remand.

The three-member dissent ventured further into the unpredictable eddies of the stream of commerce—and found those currents to be deep and the stream broad indeed. The dissent argued that in product liability cases the question of whether a product's use or purchase was an isolated instance or part of a continuous occurrence was important but not decisive. *Hapner*, 404 Mich. at 178–179, 273 N.W.2d 822. The dissent urged that it is the economic reality of a manufacturing enterprise rather than the "outward form" of the business transaction which is the critical inquiry. To the dissent, the cornerstone must be foreseeability. Thus an isolated use or purchase could still establish jurisdiction unless such isolated case conclusively establishes *lack* of foreseeability. The defendant manufacturer placed its product in a broad stream of commerce, the dissent suggested, and concluded that public policy dictated the exercise of personal jurisdiction. *Id.* at 181, 273 N.W.2d 822. Adopting the reasoning of the Washington Court of Appeals, it noted that the breakdown in international commercial barriers and the increasing numbers of goods sold to American consumers by foreign manufacturers would leave such consumers unprotected if American courts did not recognize personal jurisdiction under such circumstances. *Id.*

Interestingly, the *Asahi* plurality suggested an opposing concern to that of consumer protection if "aliens" were to be subjected to the far-reaching grasp of a state's long-arm statute. The Court noted that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi*, —— U.S. at ——, 107 S.Ct. at 1035, 94 L.Ed.2d at 106 (other citations

omitted). The Court did not give much guidance as to precisely how a lower court should proceed with its inquiry but did indicate that "[t]he procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case." *Id.*

It is true that here the defendant is not at a great distance from the plaintiff's forum and perhaps this defendant may be said to be more familiar with the American legal system than was the Japanese defendant in *Asahi*. Still, it is clear that *Asahi* suggests that a court carefully consider the foreign policy impact of its jurisdictional decisions. In the wake of the recent expansive "free-trade" agreement with Canada, the Court reads *Asahi* as counselling extra caution in extending personal jurisdiction in matters such as this. Finally, in *Asahi*, the major manufacturer was already before the California court and the Supreme Court appeared to emphasize that the action at issue was merely an indemnity action brought by the Taiwanese defendant.

The crucial point is that nothing in *Asahi* or *Poyner* indicates that the Michigan Supreme Court would or could embrace a view of "foreseeability" that proposes that merely placing a product in the stream of commerce knowing it may eventually end up in a forum is a constitutionally sufficient contact for the purpose of allowing the forum to exercise personal jurisdiction. In *Poyner, supra,* the Sixth Circuit observed that a foreign-based manufacturer cannot automatically insulate itself from jurisdiction by using an independent distributor. The foreign-based manufacturer was actually a wholly-owned subsidiary of its American parent corporation. The foreign-based manufacturer chose not to distribute its product (an automatic pistol) *via* its own corporate organization but sought out an independent distributor instead. The Sixth Circuit noted that this "independent" distributor had actively solicited business in the forum state, advertised nationally, sold the products to a sub-distributor in the forum state, and had salesmen and warehouses in nearby states capable of

serving customers in the forum state. The *Poyner* court concluded that the foreign corporation was certainly aware of the distributor's efforts to sell its products and found that defendant had purposefully availed itself of the privilege of acting in the forum state or causing a consequence there. *Poyner,* 618 F.2d at 1190.

Here, plaintiff argues that Bell should not be permitted to manufacture an expensive, potentially dangerous device which it merely placed in the steam of commerce and then not be subject to the jurisdiction of the state in which its product is installed. Still, plaintiff has offered no evidence to rebut defendant's affidavit that it has never participated in any marketing, advertising, or distribution system in or directed toward Michigan. Again plaintiff has not argued nor produced any evidence that KMW acted as an agent and/or a distributor of Bell products.

It is true that the *Asahi* court identified examples of the kinds of behavior which may indicate an intent or purpose on the part of a manufacturer to serve the market in a forum state: 1) designing the product for the market in the forum state; 2) advertising in the forum state; 3) establishing channels for providing regular advice to customers in the forum state; and 4) marketing products through a distributor who has agreed to serve as the sales agent in the forum state. *Asahi,* 480 U.S. at ——, 107 S.Ct. at 1032, 94 L.Ed.2d at 104.

The Court finds plaintiff's argument that Bell has designed its product for the forum state because Bell builds its boilers to comply with the ASME code and/or because it sought (after the fact) information from the Michigan Department of Labor to "update its files" insufficient evidence of purposeful conduct and ultimately unpersuasive. There has been no evidence presented—by affidavit or otherwise—that defendant specifically designed its product to be sold in Michigan. None of the other *Asahi* factors is relevant here as is obvious from the Court's previous analysis.

Significantly, plaintiff's arguments and case law support, in the main, flow from its

assertion that it has brought an action in tort. However, notwithstanding the labels plaintiff has assigned its causes of action, it appears to the Court that plaintiff's claims sound in contract, not tort. *Cf. e.g., Consumers Power Co. v. Mississippi Structural Steel Co.*, 636 F.Supp. 1100 (E.D.Mich.1986) (holding that under Michigan law an owner and builder of a nuclear power plant had no claims sounding in tort against the manufacturer of defective heat-treated reactor vessel anchor bolts, where the only damages pleaded were commercial economic losses resulting from the defects in the bolts. Plaintiff's exclusive remedies were governed by the U.C.C.)

In addition, plaintiff's reliance upon *American Business Overseas v. Methods Research Products, Inc.*, 593 F.Supp. 1 (W.D.Mich.1983) is misplaced. In *American Business*, the court noted that while a single advertisement in a national publication is not enough to confer personal jurisdiction over the defendant advertiser in all states, the defendant had actually participated in negotiations for some ten months prior to entering into a contract with a Michigan corporation. The court noted that although the plaintiff had initiated the discussions between the parties, the defendant had subsequently telephoned and corresponded with the plaintiff's Michigan offices. Under those facts, the court found that the relationship between plaintiff and defendant satisfied the purposeful availment requirement. *American Business*, 593 F.Supp. at 4.

The problem with the numerous contacts which this defendant has had with Michigan concerning the replacement boiler is that those contacts occurred after the cause of action arose and therefore cannot be used to satisfy the second element of *Mohasco*. In sum, based on the facts before this Court, I find that Bell has not purposefully availed itself of acting or causing a consequence in Michigan and that Andrews's cause of action against Bell does not arise from any activity by Bell in Michigan. For that reason Bell cannot satisfy the third requirement that there is a substantial enough connection with Michigan to make the exercise of jurisdiction reasonable. This last finding may seem incongruous to the plaintiff given the subsequent development of events, but all of the extensive interaction that defendant has had with plaintiff and the forum state occurred *after* plaintiff's cause of action arose. Moreover, those contacts cannot be applied retroactively in this instance to satisfy the first two requirements of *Mohasco*.

### Conclusion

The Court concedes that the issue of minimum contacts in this case is a close question—one which has been well argued by both sides. The Court finds some merit in plaintiff's apparent suggestion that the Supreme Court appears to be moving away from an emphasis on the "minimum contacts" requirement towards some sort of "reasonableness test" in which a determination of personal jurisdiction would be made by balancing all of the relevant factors. Nevertheless, such a test has not, as yet, been fashioned by the Supreme Court or the Sixth Circuit. Accordingly, I must find, based on the state of the law as I now understand it to be, that plaintiff has not met its burden.

I find that where Bell has sold three small boilers in Michigan between the years 1971 and 1982 it does not carry on a "continuous and systematic part of its general business" in Michigan and for that reason M.C.L. § 600.711 is inapplicable. Further, plaintiff's claims do not arise from the transaction of any business in Michigan by Bell or its agents and its claims do not "arise" from an act or occurrence in Michigan by Bell resulting in an action for tort. Moreover, plaintiff's claims actually sound in contract, not in tort. Accordingly, limited personal jurisdiction over Bell does not exist under M.C.L. § 600.715.

Further, I have found that even had Michigan's statutory jurisdictional requirements somehow been met, the exercise of *in personam* jurisdiction under these facts would nonetheless violate the requirements of the due process clause of the fourteenth amendment within the meaning of *Mohasco* and *Asahi*. Accordingly, I will enter an

order granting defendant Bell's motion to dismiss.